Coleman WHITMILL

v.

CITY OF PHILADELPHIA, et al.

Civil Action No. 96–5216.

United States District Court,
E.D. Pennsylvania.

Nov. 5, 1998.

Jeffrey M. Scott, City of Philadelphia, Law Dept., Philadelphia, PA, Bradford A. Richman, City of Philadelphia Law Dept., Philadelphia, PA, Edward D. Chew, Jr., Philadelphia, PA, for City of Philadelphia.

Jeffrey M. Scott, City of Philadelphia, Law Dept., Philadelphia, PA, Janet F. Ginzberg, Bradford A. Richman, City of Philadelphia, Law Dept., Philadelphia, PA, Edward D. Chew, Jr., Philadelphia, PA, for Richard Neal, Captain John Doe, Lieutenant John Doe, Sergeant John Doe, Police Officers John Doe #1–3.

Valerie Greenberg, Philadelphia, PA, for Philadelphia Dist. Attorney's Office, movant.

Edward D. Chew, Jr., Philadelphia, PA, for Officer DiPasquale, Office Swarez, Joseph Scullin.

### MEMORANDUM AND ORDER

HART, United States Magistrate Judge.

In this civil rights case, the court granted judgment as a matter of law in favor of the City of Philadelphia and the former Police Commissioner on the plaintiff's *Monell* claim. Thereafter, the jury returned a verdict in favor of the remaining defendants on the remainder of the claims. Presently before the court is plaintiff's "Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial." In his motion, plaintiff makes several assertions of trial court error. Each will be addressed individually. However, much of Plaintiff's motion rests on his argument that Mr. Whitmill's brief detention and 5 block transportation prior to his being identified by two eyewitnesses constituted an arrest as a matter of law. Therefore, the court will address that issue first.

On July 24, 1994, Coleman Whitmill was stopped by Police Officers William Suarez and Nicholas DiPasquale at 15th and Butler Streets because, according to the officers, Mr. Whitmill fit the description of one of the perpetrators of a robbery/kidnapping, and later shooting, that had occurred earlier in the day. The officers handcuffed Mr. Whitmill and placed him in the back of their police van, waiting for one of the witnesses to arrive to identify Mr. Whitmill.

Alan E. Denenberg, Philadelphia, PA, Armando A. Pandola, Jr., Armando A. Pandola, Atty. at Law, Philadelphia, PA, for Coleman Whitmill.

While waiting for the witness, a news van parked near the police van and a cameraman exited the vehicle. In order to protect Mr. Whitmill's privacy and in order to prevent any taint of the investigation, Officers Suarez and DiPasquale drove Mr. Whitmill five blocks to Temple Hospital for the identification procedure. There, Frederick Boyle, an off-duty Housing Authority Officer who had given chase to the get-away vehicle and been shot, and Mr. Joseph Roche, a witness to the Boyle shooting, were taken, individually, to the back of the police van in order to view Mr. Whitmill. Mr. Whitmill was never asked to face the witnesses, stand up, or exit the vehicle. However, at the time of the identifications plaintiff was seated just inside the rear door of the van. The two witnesses were taken, individually, to the rear door to complete their identifications. Both positively identified Mr. Whitmill as one of the occupants of the get-away van. Thereafter, Mr. Whitmill was charged and stayed in prison twenty-nine days before the charges against him were dropped by the District Attorney's Office.[1]

Prior to trial, plaintiff filed a motion for partial summary judgment, asking the court to find, as a matter of law, that his 5 block transportation to Temple Hospital for the identification constituted an arrest. The court declined to do so, finding that federal law required a balancing of the nature and extent of the intrusion with the governmental interests at stake. In our opinion, we held that state law permitted the transportation of a suspect if exigent circumstances existed to justify such transportation. *See Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982); *Whitmill v. City of Philadelphia*, No. 96–5216, 1998 WL 476187(Memorandum and Order denying Partial Summary Judgment, Aug. 11, 1998). Since no Pennsylvania court or federal court had ever been faced with the precise question of whether the presence of a news van at an identification procedure could constitute an exigent circumstance, we permitted this issue to go to the jury.

As previously mentioned, the jury returned a defense verdict, separately finding that (1) the plaintiff had not been subject to arrest during his transportation to Temple Hospital; and (2) that following his identification, when plaintiff was admittedly arrested, this arrest was with probable cause. The plaintiff now takes exception to the court's denial of partial summary judgment, and the court's charge on the elements of a false arrest.

As for the plaintiff's first assertion, prior to trial, we denied plaintiff's motion for judgment as a matter of law, finding that the mere transportation of a suspect does not automatically transform a lawful *Terry* stop into an unlawful arrest. As for the later, the court correctly stated the law on the definition of an arrest, as stated by the Supreme Court and our Circuit Court.

In ruling on the summary judgment motion and in drafting the charge to the jury, this court was guided by the well reasoned opinion of the Honorable Majorie O. Rendell, in *Owens v. County of Delaware*, No. 95–4282, 1996 WL 476616 (E.D.Pa., Aug.15, 1996). In *Owens*, Quandeel Young had been stopped by an officer who had received information about a stabbing in the area. When the officer saw Young, who matched the description he had received, the officer stopped Young, handcuffed him to a telephone pole, and patted him down. In the motion for summary judgment, Young argued that his detention for twenty to thirty minutes while handcuffed to a telephone pole constituted an arrest as a matter of law.

Judge Rendell, after analyzing the facts of the case within the framework adopted by the Supreme Court and the Third Circuit, concluded that plaintiff had not been arrested during his original detention.

> [T]here is no bright-line rule differentiating an arrest from a detention supportable by less than probable cause. See *[Florida v.] Royer*, 460 U.S. [491,] at 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 [ (1982) ].

1. On October 5, 1998, the court granted plaintiff's motion to be excused from ordering a transcript in the case due to his financial condition. Therefore, the only references to the transcript are the testimony of James J. Fyfe, Ph.D., plain-

tiff's expert on police practices, and David Thalheimer, the Assistant District Attorney in charge of Mr. Whitmill's case. The court ordered these portions of the transcript on its own, in order to write this opinion.

Thus, whether a seizure is an arrest or merely an investigatory detention depends on the reasonableness of the level of intrusion under the totality of the circumstances. *See [United States v.] Sharpe,* 470 U.S. [675,] at 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 [ (1984) ]. Although there is "no rigid time limitation on Terry stops, "*Sharpe,* 470 U.S. at 685, [105 S.Ct. 1568], a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687, [105 S.Ct. 1568]. Thus, although precise definitions are not possible, one court has noted that "an arrest is a seizure characterized by highly intrusive or lengthy search or detention." *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir. 1986). The Third Circuit has noted that "[u]nder the Terry cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect. *Edwards,* 53 F.3d at 619 (quotations omitted)."

*Owens,* at *11.

In concluding that Young's detention did not constitute an arrest, Judge Rendell considered the length of his detention and nature of his detention, including his being handcuffed to a telephone pole, along with the actions of· the officers, including their diligence in conducting their investigation.

▇ Although Mr. Whitmill was handcuffed, placed in the back of a police van, and moved a few blocks without his permission, this intrusion must be weighed against the governmental interests at stake. These officers were investigating a robbery/kidnapping and shooting. Their concerns included their own safety (in handcuffing Mr. Whitmill), the investigation of two violent incidents, and their concern in protecting the privacy of Mr. Whitmill. There is no evidence that the officers ˙prolonged Mr. Whitmill's detention any longer than necessary to allow the witnesses to identify him at a neutral location. Under the totality of the circumstances, the court could not conclude, as a matter of law, that Mr. Whitmill's transportation amounted to an arrest.[2]

The court similarly used Judge Rendell's reasoning, and the cases upon which she relied, when instructing the jury on the definition of an arrest and the point at which a Terry Stop becomes an arrest that must be supported by probable cause.

Although there is no hard and fast rule about when a Terry Stop becomes an arrest, the determination depends on the reasonableness of the level of intrusion under the totality of the circumstances. An arrest is a seizure characterized by any or all of the following: 1) it is highly intrusive; 2) it includes a lengthy search; 3) it includes a lengthy detention.

The reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens, and considering the relation of the policeman's actions to his reason for stopping the suspect.

As I said, there is no hard and fast rule as to when a lawful "Terry Stop" becomes an arrest that must be supported by probable cause. For example, it is not the law that handcuffing a suspect, by itself, automatically turns a "Terry Stop" into an arrest. However, handcuffing is one fact you may consider in deciding if the Officer's conduct, as a whole, turned the Terry Stop into an arrest prior to Mr. Whitmill's identification. It is also not the law that any transportation of a suspect from Point "A" to Point "B" automatically turns the stop into an arrest. In fact, the law permits a transportation from one spot to another if there are exigent circumstances present that justify such a transportation. In this case, Officers DiPasquale and Suarez have testified that they believed the presence of the Channel 6 News Van provided such exigent circumstances. It will be up to you, members of the jury, to decide if you agree that the news van was present and provided such exigent circumstances.

**2.** In fact, James J. Fyfe, Ph.D., plaintiff's expert witness, expressed the opinion that it was acceptable police practice to handcuff a suspect such as Mr. Whitmill. (N.T. 9/1/98, 26).

If you determine that Plaintiff's arrest occurred at any time prior to his identification by Officer Boyle and Mr. Roche, I instruct you, as a matter of law, that probable cause did not exist at that point in time to arrest Plaintiff. Therefore, if you find that he was under arrest before he was identified, you must award him damages for whatever harm you decide he suffered during the period between the arrest and his subsequent identification. (Court's charge to the jury).

■ Since this charge accurately reflects the test set forth by the Supreme Court, the court did not commit any error.

The plaintiff also claims that the court erred in failing to incorporate plaintiff's proposed charge, defining an arrest. Relying on *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982), the plaintiff urged the following language:

Placing a suspect such as Mr. Whitmill in a police vehicle in order to transport him to the location of an alleged witness to a crime for the purposes of a confrontation without the suspect's consent and without exigent circumstances, constitutes an "arrest" and is a "seizure of the person" within the meaning of the Fourth Amendment.

Although the Pennsylvania Supreme Court found that Lovette's transportation to the scene of the offense for a confrontation constituted an arrest, in coming to that conclusion the court conducted the balancing test set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The undersigned instructed the jury at length concerning this balancing test. *See supra*, at 243–44. The decision in *Lovette* could not dictate the conclusion in Mr. Whitmill's case because, unlike Lovette's transportation, Mr. Whitmill's was prompted by the presence of a news van and camera man. Additionally, Mr. Whitmill was transported to a neutral location, rather than the scene of the crime. Since the Pennsylvania Supreme Court left undefined what would constitute an exigent circumstance permitting the movement of the suspect, this court instructed the jury that it was for them to determine whether the presence of the news van constituted such a circumstance.

Furthermore, plaintiff argues in his Memorandum of Law that neither Mr. Whitmill's nor the officers' safety was in jeopardy. Contrary to this assertion, the plaintiff's own expert testified that for the officers' protection and the protection of the public, it was acceptable for the officers to handcuff Mr. Whitmill. (N.T. 9/1/98, 29). Furthermore, the officers testified that they moved Mr. Whitmill to prevent his filming and appearance on the news. Such filming would have been a threat to Mr. Whitmill's privacy. Therefore, a strong argument can be made that Mr. Whitmill's transportation was specifically to ensure his safety. Hence this case turns into "damned if you do, damned if you don't." The officers could just as easily have found themselves sued if they had *not* moved plaintiff away from the camera, especially if, as it turned out, he was identified by two witnesses.

Finally, to adopt the reasoning urged by the plaintiff would unreasonably limit the scope of *Terry*. In this case, plaintiff was transported approximately five blocks for the confrontation. The plaintiff urges that *any* transportation under these circumstances constitutes an arrest. Taking this argument to its logical conclusion, requesting a suspect to accompany an officer to his car, which might be located only a half a block away, would also constitute an arrest. To adopt this reasoning ignores the balancing test enunciated in *Terry* and its progeny.

■ The plaintiff next claims that the court erred in granting the defendants' motion for judgment as a matter of law regarding the *Monell* claim against the City of Philadelphia and former Police Commissioner Richard Neal. Contrary to the plaintiff's assertion, there was insufficient evidence from which one reasonably could find the City or Police Commissioner Neal liable.

■ In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court concluded that liability of a government entity under § 1983 may not be founded under the doctrine of *respondeat superior*, but rather only upon evidence that the governmental unit itself supported a violation of constitu-

tional rights. *See Monell,* 436 U.S. at 691–95, 98 S.Ct. 2018. Hence, a municipality may only be found liable when "the alleged constitutional transgression implements or executes a policy, ... officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (citing *Monell,* at 658, 98 S.Ct. 2018).

Therefore, municipal liability must be based on either municipal policy or custom. In *Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir.1990), the Third Circuit articulated the distinction between these two sources of liability.

> [A] government policy or custom can be established in two ways. Policy is made when a "decision maker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Id.* at 1480. *See also Beck,* at 971.

In this case, the plaintiff's own expert testified that the policies and regulations in place in the City of Philadelphia were "generally in accord with accepted police practices." (N.T. 8/31/98, 39). Additionally, Dr. Fyfe, testified that Directive 58, the policy of the Philadelphia Police Department regarding arrest and identification, comports with the standards set forth by the International Association of Chiefs of Police. (N.T. 8/31/98, 27). Therefore, the only ground on which the plaintiff's *Monell* claim can proceed is custom. Yet, the only evidence supporting the plaintiff's assertion that the actions of these officers constituted a custom of the Philadelphia Police Department was the completely conclusory testimony of Dr. Fyfe that the officers' actions, and the fact that they were not disciplined, somehow constituted a custom of the Police Department. (N.T. 8/31, 47). Dr. Fyfe, however, failed to cite to a single additional case in which Directive 58 was allegedly violated by a Philadelphia police officer. Although Dr. Fyfe did refer to the 39th District litigation, and the *Blount,*

and *Agresta* cases, the defense distinguished those cases on cross-examination when asking Dr. Fyfe about the underlying facts of each. None of those cases involved the movement of a suspect, or the identification procedure utilized by Officers Suarez and DiPasquale. (N.T. 9/1/98, 48–53).

Since there was no evidence from which the jury could find the City or Commissioner Neal liable, the court did not err in granting the defense motion for judgment as a matter of law at the close of plaintiff's case. *See* F.R.Civ.P. 50(a)(1).

Furthermore, in order to succeed on his *Monell* claim, the plaintiff would have to show that the officers themselves did something violative of the Constitution, and that the City and the former Police Commissioner then somehow condoned the officers' actions, either explicitly or implicitly. As previously stated, however, after applying the law to the facts of Mr. Whitmill's detention, the jury found that the officers did not violate plaintiff's constitutional rights. Therefore, unless the court erred in letting the transportation issue even go to the jury, or erred in its charge on false arrest, there can be no *Monell* claim regardless of the City's or Commissioner's conduct.

■ The plaintiff next contends that the court erred in precluding Dr. Fyfe from expressing an opinion regarding the legality of Mr. Whitmill's stop, transportation, and identification and not permitting him to testify concerning the credibility of the officers. In his expert report, Dr. Fyfe, who is not a lawyer, concludes that "this was not a proper *Terry* stop." (Report of Fyfe, at 3). "As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2nd Cir.1991) (citing *Expert Legal Testimony,* 97 Harv. L.Rev. 797 (1984)). This issue, as the court discussed earlier, was a matter for the jury to decide after proper instruction from the court. Allowing the plaintiff to elicit such testimony from an expert witness would have usurped the role of the court and the jury.

■ Similarly, Dr. Fyfe's report contained a lengthy discussion of Officer Suarez's credibility. Credibility determinations are within

the exclusive province of the fact finder. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (citing *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir.1987) *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)). Allowing Dr. Fyfe to testify concerning Officer Suarez's credibility would have usurped the jury's role in accessing credibility.

> [The use of expert testimony] must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.

*Bilzerian*, at 1294. Therefore, the court did not err in limiting Dr. Fyfe's testimony.

The plaintiff next contends that the court erred in allowing former District Attorney David Thalheimer to testify in an expert capacity and allowing him to offer opinion testimony. Contrary to the plaintiff's assertion, Mr. Thalheimer testified as a fact witness. He was the Assistant District Attorney who handled Mr. Whitmill's case and the dismissal thereof. In his testimony, Mr. Thalheimer informed the court and the jury of his conclusions concerning the weight of evidence against Mr. Whitmill and the decision to dismiss the case. Although Mr. Thalheimer also stated that, in his opinion, the officers had probable cause to arrest Mr. Whitmill after he was identified, the court specifically instructed the jury that Mr. Thalheimer was being proffered only as a fact witness, not as an expert witness. (N.T. 9/3/98, 13). If there was any question in a juror's mind concerning Mr. Thalheimer's status following this instruction, plaintiff's counsel clarified his status.

> Q. You're not here as any kind of expert in civil right law, are you, sir?
>
> a. No.
>
> Q. You're not here trying to tell us that your opinions concerning civil rights law should be given any weight or merit, you're here to tell us the facts—
>
> a. Yes.

(N.T. 9/3/98, 30). Therefore, it is clear that Mr. Thalheimer's testimony was offered only to show his personal reasons for dismissing the prosecution.

■ The plaintiff next makes several claims regarding the defendants' last minute response to the plaintiff's amended complaint. In their original answer, the defendants admitted that the defendants had arrested the wrong individual. After the plaintiff filed an amended complaint, identifying the officers by name, the defendants filed an amended answer, in which they denied that the defendants had arrested the wrong person. At trial, the court did not permit the plaintiff to read the defendants' original response to the jury.

Pursuant to Federal Rule of Civil Procedure, 15(a), the defendants had a right to respond to the amended complaint, and Rule 15 does not limit the response only to those items that have been changed or amended.[3]

Furthermore, the error, if any, in not permitting the plaintiff to read the defendants' original response, is harmless. Although the officers' beliefs at the time they stopped and subsequently arrested Mr. Whitmill are relevant to the consideration of probable cause, the defendants' personal beliefs of guilt or innocence, expressed at the conclusion of all the proceedings, are irrelevant to the consideration of the claims presented in this case. "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

The plaintiff next contends that the court erred in permitting Officer Boyle to testify that he had previously identified individuals who were handcuffed in police custody. Defendants offered this testimony in support of their claim that a trained police officer like Boyle could view a suspect in handcuffs without having his objectivity tainted. Plaintiff claims it was error to have allowed this testimony because there was no proof that either

---

3. Although Rule 15 requires a response to an amended pleading within ten days, the plaintiff did not seek to compel such a response or seek a default judgment pursuant to Federal Rule of Civil Procedure 55.

arresting officer *knew* that Boyle worked in law enforcement. Initially, the court notes that plaintiff's counsel did not object to Officer Boyle's testimony regarding his prior identifications. Therefore, this argument is waived.

More importantly, the officers *were* aware of Officer Boyle's status as a Housing Officer. When Officer Boyle was shot, the radio broadcast indicated that an officer had been shot. Furthermore, the defendant officers' knowledge of Boyle's training was a proper subject of cross-examination. The plaintiff could have easily cross examined Officer Boyle to determine if he had made any representations to the defendant officers at the time he identified Mr. Whitmill concerning his own past experiences identifying suspects who were handcuffed. Plaintiff's counsel may have been better prepared to conduct such a cross-examination had they not permitted Officer Boyle to testify without being deposed. Prior to trial, the court issued an order in response to plaintiff's motion to preclude Officer Boyle's testimony, requiring that plaintiff's counsel be permitted to depose Officer Boyle prior to his presenting any testimony at trial. At trial, plaintiff's counsel permitted Officer Boyle to testify although he had not been deposed. Therefore, any lack of knowledge on the plaintiff's part regarding the content of Officer Boyle's testimony was caused by their own trial tactics.

The plaintiff next claims that the verdict was against the weight of the evidence due to the action or inaction of Detective Scullin. A court can grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). A new trial may be granted where "the verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel University*, 852 F.2d 715, 735 (3d Cir.1988). The decision to grant or deny a motion for a new trial "is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Industries*, 972 F.2d 507, 512 (3d Cir.1992). However, the court's discretion is more limited when granting a new trial because the jury's verdict is against the weight of the

evidence. *See Hourston v. Harvlan*, 457 F.2d 1105, 1107 (3d Cir.1972). A new trial "cannot be granted ... merely because the court would have weighed the evidence differently and reached a different conclusion." *Markovich v. Bell Helicopter Textron, Inc.*, 805 F.Supp. 1231, 1235 (E.D.Pa.) *aff'd*, 977 F.2d 568 (3d Cir.1992).

Specifically, the plaintiff claims that the verdict is against the weight of the evidence because Detective Scullin's reports are inaccurate, incomplete, or misleading. Two of these assertions focus on the allegedly inconsistent roles that Mr. Roche and Officer Boyle claimed Mr. Whitmill played in the crime. Mr. Roche identified Mr. Whitmill as the driver of the van and Officer Boyle identified Mr. Whitmill as the shooter. The plaintiff claims that Detective Scullin failed to make the District Attorney aware of this disparity.

Contrary to the plaintiff's assertion, Detective Scullin did inform the District Attorney of the fact that although both Officer Boyle and Mr. Roche identified Mr. Whitmill, they were each identifying different subjects involved in the shooting of Officer Boyle. Detective Scullin's investigation report discloses this information. (Defendants' Exhibit 6). Additionally, Mr. Thalheimer, the Assistant District Attorney assigned to Mr. Whitmill's case, testified that he was aware of this disparity.

> In hearing you ask the question, I recall now for the first time in years that one of the issues in the case was that, while we had identifications of the same individuals, different—different roles were attributed to some of these individuals by the various witnesses. But beyond that I have no real recollection.

(N.T. 9/3/98, 26). Since Detective Scullin disclosed the identification disparity, the plaintiff's claims are meritless.

The plaintiff also claims that Detective Scullin failed to disclose exculpatory evidence. Specifically, the plaintiff claims that Detective Scullin's reports failed to disclose the inability of two witnesses to pick Mr. Whitmill out of a photo array. However, there was no evidence that either of these witnesses, Kathy Parker or Walter Priestly,

were actually presented with photo arrays containing Mr. Whitmill's photograph. Both testified that they saw individuals involved in the robbery or shooting for only a short period of time. Mr. Priestly gave a description of the driver to the police and Ms. Parker testified that she would not be able to identify anyone.

Additionally, Mr. Thalheimer testified that such a photo array could not have been conducted after Mr. Whitmill was charged and arraigned, because once a suspect is charged, it is no longer the decision of the police to conduct a line-up or an array. (N.T. 9/3/98, 38).

The plaintiff also complains that Detective Scullin's Criminal Complaint Fact Record was false and misleading because, although the police reports state that Mr. Whitmill was stopped just two blocks from the location where the get-away van was abandoned, the reports fail to indicate that Mr. Whitmill was also just a block from his home. Contrary to this assertion, the Criminal Complaint Fact Record in Detective Scullin's file contained both Mr. Whitmill's address (1521 Butler Street), and the spot of his detention (1500 Butler Street). (See Exhibit P–28, S–6). Although Scullin did not mention in his narrative the proximity of Mr. Whitmill's home to the location where he was stopped, because Mr. Whitmill's address is at the very top of the form, it is evident from reading the report that he was within a block of his home at the time. (See Exhibit P–28, S–6).

Plaintiff also complains that because the police reports failed to disclose the presence of a news van at the location where Mr. Whitmill was initially stopped, there was no basis for the jury to conclude that any such van was present. This is incorrect. Both officers testified that the reason that they transported Mr. Whitmill to Temple Hospital was the presence of the news van. In addition, Mr. Thalheimer testified that he was aware that the press on the scene was an issue in the case. (N.T. 9/3/98, 32). Therefore, there was ample evidence from which the jury could have concluded that a news van was on the scene after Mr. Whitmill was stopped, and that this was the reason for his transportation to Temple Hospital.

Finally, the plaintiff claims that "it was abundantly clear that Coleman Whitmill was subjected to an overly suggestive confrontation when he was misidentified while in handcuffs in the rear of a police patrol wagon." (Plaintiff's Motion, at 5). An identification is considered overly suggestive if the circumstances of the identification created "a very substantial likelihood of misidentification." *United States v. Sebetich,* 776 F.2d 412, 417 (3d Cir.1985) (citing *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). First, plaintiff cites no authority for the proposition that an identification becomes overly suggestive simply because the suspect is handcuffed in a patrol wagon. Like probable cause itself, or the definition of an arrest, an overly suggestive identification depends on the totality of the circumstances. Even plaintiff's police expert, Dr. Fyfe, did not opine that handcuffing and van placement *alone* tainted the identification.

Next, the jury heard more than enough evidence to find, as it did, that the identification was not overly suggestive. Both witnesses were taken, individually, to the back of the van, where Mr. Whitmill was seated in plain view. It was daylight. Both witnesses were emphatic in their identifications. And both witnesses were asked to view plaintiff not once, but twice. In addition, Officer Boyle testified that as a Housing Authority Police Officer, he had previously identified handcuffed people in police custody.

Having disposed of all of the Plaintiff's claims, the court will deny Plaintiff's "Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial." An appropriate order follows.

### ORDER

AND NOW, this 5 day of Nov., 1998, upon consideration of Plaintiff's "Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial," the Defendants' response, the Plaintiff's reply, and the Defendants' reply to the Plaintiff's Reply, for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that the "Motion for Judgment as a Matter of

Law or in the Alternative Motion for a New Trial" is DENIED.